UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **2:24-CR-20308-TGB-APP-1** |
| Plaintiff, | |
| | HON. TERRENCE G. BERG |
| **v.** | |
| | **ORDER DENYING** |
| | **DEFENDANT'S MOTIONS** |
| **RUBY SCOTT,** | **TO SUPPRESS AND** |
| | **DISMISS** |
| Defendant. | |
| | **(ECF NOS. 21; 23)** |

The government charged Ruby Scott with conspiring to illegally pay for referrals for services which may be paid for under Medicare, and with conspiring to receive reimbursement from Medicare for claims procured by such illegal referrals. ECF No. 1, PageID.5-7, 9-10. Scott filed a Motion to Suppress statements she made to government investigators, ECF No. 21, and a Motion to Dismiss the government's Indictment. ECF No. 23. After carefully reviewing the record and the law, and considering the testimony presented at an evidentiary hearing held on May 12, 2025, the Court determines that both Motions must be **DENIED**.

## I. BACKGROUND

The government filed its Indictment against Scott on June 13, 2024. ECF No. 1, PageID.12-13. The Indictment alleged that Scott conspired to defraud the United States by paying one Kysha Marshall for patient

referrals for Medicare-reimbursable services. ECF No. 1, PageID.5-6. The Indictment charges that this conspiracy violated Title 42, United States Code, Section 1320a-7b(b)(2)(A) (the "Anti-Kickback Statute" or "AKS"). *Id*. Scott also allegedly conspired to receive Medicare reimbursement for claims procured with illegal kickbacks. *Id*. at PageID.8.

The Indictment alleged that Scott "willfully and knowingly" engaged in this conspiracy to pay kickbacks, in violation of the Anti-Kickback Statute, and that Scott and Marshall "knew and understood that it was illegal to pay and receive kickbacks in exchange for the referral of Medicare beneficiaries." *Id*. at PageID.6, PageID.8.

Before Scott was indicted, Federal Bureau of Investigations Special Agents Steve Warren and Collin Ward interviewed her at her home on April 12, 2024. ECF No. 21, PageID.142, 144. At the evidentiary hearing on May 12, 2025, Scott testified that the Special Agents first stated that they were there to speak with her about other individuals. Upon hearing this, Scott invited them into her home. Only later in the conversation did the Special Agents reveal that she was the target of the investigation, and provide her with a target letter informing her of that fact.

Scott testified that her conversation with the Special Agents only lasted for ten or fifteen minutes, while the testifying agents stated that it took thirty minutes. The agents did not handcuff or otherwise attempt to restrain Scott's movements, they did not draw their weapons, which were concealed, and they did not raise their voices.  They appeared at her

2

home around 9:30 a.m. They sat on the opposite side of the room from her when they spoke. Scott testified that the agents actually offered to help her bring in her groceries, which had been left outside of her door.

Scott testified that when initially asked about Marshall, she said she did not know her because they mispronounced Marshall's first name. The Special Agents accused her of lying when she told them that she did not know who Marshall was. Scott alleged that the agents "repeatedly warn[ed] [Scott] that lying to federal agents is a crime." *Id.* at PageID.148. At one point in the conversation, Scott "explicitly asked whether she needed an attorney." ECF No. 21, PageID.145. After she asked this question, the agents continued to question her. *Id.* But Scott also admits that the agents told her that her interview was "completely voluntary." *Id.* at PageID.145.

On January 21, 2025, Scott filed a Motion to Suppress the statements she made to the Special Agents on April 12, 2024. ECF No. 21. Also on January 21, 2025, Scott filed a Motion to Dismiss the Indictment. ECF No. 23. The government filed responses to those Motions on February 11, 2025. ECF Nos. 29, 28. On May 12, 2025, the Court held an evidentiary hearing on Scott's Motions, at which it heard argument, as well as testimony from Scott and the two Special Agents who spoke to her on April 12, 2024.

## II. ANALYSIS

### A.    Motion to Suppress

Scott argues that the Fifth and Sixth Amendments to the Constitution require the Court to suppress the statements she made to government agents on April 12, 2024. ECF No. 21, PageID.142-45. These arguments are without merit, so the motion to suppress will be denied.

Scott's Sixth Amendment argument is that she was denied the right to counsel during the interview with agents at her home. But the Sixth Amendment right to counsel applies only after the prosecution has commenced. *Texas v. Cobb*, 532 U.S. 162, 167-68 (2001). Scott's prosecution commenced with her Indictment on June 13, 2024. ECF No. 1, PageID.12-13. Her interview took place months earlier, in April 2024. ECF No. 21, PageID.142. Insofar as the Motion to Suppress relies on the Sixth Amendment, the Motion is **DENIED**.

### 1.    The *Miranda* Standard

Defendant contends that the agents violated her Fifth Amendment right against compelled self-incrimination because they failed to advise of her right not to incriminate herself. Under the *Miranda* line of cases, police are required to advise suspects of their rights when they are in police custody. Statements given by suspects in custody without *Miranda* warnings are subject to suppression. *See Miranda v. Arizona*, 384 U.S. 436, 467-74 (1966).

4

But the *Miranda* warnings—and the accompanying remedy of suppression if they are not given—are only required if a suspect is subject to "custodial interrogation." *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010). The "ultimate inquiry" in determining whether custodial interrogation occurred is whether there was a "restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (*quoting Stansbury v. California*, 511 U.S. 318, 322 (1994)). The Sixth Circuit decides "whether an interrogation was of a custodial nature" by considering several factors, such as:

> (1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions.

*Hinojosa*, 606 F.3d at 883.

This analysis focuses on the objective circumstances of the interrogation, to determine how a reasonable person in the position of the individual being questioned would "gauge the breadth of his or her freedom of action." *Panak*, 522 F.3d at 465 (*quoting Stansbury*, 511 U.S. at 323, 325). The analysis does *not* depend on "the subjective views harbored by either the interrogating officers or the persons being questioned." *Stansbury*, 511 U.S. at 323.

Additionally, when someone being subjected to custodial interrogation makes an "unambiguous or unequivocal request for counsel," the police must stop questioning that person until an attorney representing them is present. *Davis v. United States*, 512 U.S. 452, 458-59, 461-62 (1994).

### 2.    The "Custody" Analysis

After reviewing the facts, the law, and hearing testimony from Scott and the agents who spoke to her, the Court concludes that based on the objective circumstances of the interrogation, Scott was not subject to a "restraint on freedom of movement of the degree associated with a formal arrest." *Panak*, 552 F.3d at 465. Scott was therefore not subject to "custodial interrogation," and the Special Agents' decision to not provide her with *Miranda* warnings does not support suppression.

### a.    The Questioning Took Place at Scott's Home

In making this determination, the Court considers the first factor set out in *Hinojosa*: the location of Scott's interview with law enforcement. *See Hinojosa*, 606 F.3d at 883. Scott's interview took place at Scott's home. ECF No. 21, PageID.144. And when interrogation takes place in the suspect's home, "it is usually indicative of the absence of the isolation inherent in custodial interrogation." *Coomer v. Yukins*, 533 F.3d 477, 486 (6th Cir. 2008) (*citing Beckwith v. United States*, 425 U.S. 341, 346 n. 7 (1976)). A suspect questioned in their home is less likely to be "in custody" because they are not isolated in unfamiliar surroundings.

6

*Coomer*, 533 F.3d at 486 (*quoting Miranda*, 384 U.S. at 457). The Sixth Circuit has observed that "all individuals, the meek and the brazen alike, generally will find it easier to exercise control [over the situation] on their home turf than at the station house." *Panak*, 552 F.3d at 465-66.

The fact that Scott was interviewed in her home helps support a finding that she was not in custody when she spoke to the Special Agents. She was not isolated in unfamiliar surroundings, but was in a familiar place in which she could exercise control over the conversation. Although she testified that she felt otherwise, the *Miranda* inquiry focuses on the objective conditions of the interview. A reasonable person would not have felt that they were in custody when interviewed in their own home, especially when one takes into consideration the other circumstances of Scott's interview, which the Court discusses below.

### b.     The Length and Manner of the Questioning

Where questioning takes less time, courts are less likely to find that the suspect is subjected to custodial interrogation. *See United States v. Crossley*, 224 F.3d 847, 861-62 (6th Cir. 2000), *superseded by statute on other grounds* (finding that a suspect who was interviewed for less than an hour was not subject to custodial interrogation); *United States v. Martinez*, 795 Fed. App'x 367, 376-77 (6th Cir. 2019) (affirming a district court finding that a suspect was not subject to custodial interrogation, in part because "the interview's length (eighty minutes) was not too long"

under circumstances where the suspect was free to contact others by text and phone, and was allowed to use the restroom).

Here, Scott testified that her interview took only ten or fifteen minutes. The agents recalled that considering the scope of their discussion, it probably lasted around thirty minutes. Either way, this was a short interview, which suggests that Scott was not in custody. Applying the objective standard, a reasonable person in Scott's position of being interviewed in her home for a half-hour would not have felt she was in custody comparable to being arrested.

This analysis could change if, for instance, the agents had handcuffed Scott, or approached her with drawn weapons, or shouted at her to "freeze," or appeared in her home in the middle of the night. But none of those things happened. She testified that she didn't recall seeing weapons. And they testified that they never yelled at her, raised their voices, displayed their weapons, made physical contact, or restricted Scott's physical movement. The agents also testified that they sat on opposite sides of the room from Scott—not crowding her. Scott even testified that the agents offered to help her bring in their groceries. These circumstances are not comparable to the coercive station-house pressures at issue in *Miranda*.

In her briefs and before the Court, Scott makes several arguments for why the Court should find that the circumstances of her interview meant that she was in custody.

8

Scott alleges that the Special Agents "repeatedly warn[ed] [Scott] that lying to federal agents is a crime. These warnings, coupled with the overwhelming and intimidating presence of the agents in her home, created an environment where Ms. Scott could not reasonably feel free to leave or end the interrogation." ECF No. 21, PageID.148. But the Sixth Circuit has held that a government investigator telling a suspect "that he could get into serious trouble for providing false information" did not mean that the interrogation was custodial, nor did it make the subsequent statement to the police involuntary. *United States v. Mahan*, 190 F.3d 416, 422-23 (6th Cir. 1999).

In the evidentiary hearing, Scott testified that the agents repeatedly accused her of lying when she stated that she did not know Kysha Marshall. Scott's attorney argued that these statements created a coercive environment similar to that of a formal arrest. But courts find that even when the police inform a suspect that they believe the suspect is guilty, it does not necessarily render the interrogation custodial. *See United States v. Saylor*, 705 F. App'x 369, 374-75 (6th Cir. 2017) ("We have never held . . . that a noncustodial interrogation may be transformed into a custodial interrogation simply by virtue of the fact that police confronted the defendant with evidence of guilt."); *Martinez*, 795 F. App'x at 374-75 (6th Cir. 2019) (*citing Saylor*, and finding that investigators calling a suspect's answers "bullshit" did not strongly support a finding that they were in custody).

9

Here, the circumstances of the interview show that Scott was not subject to custodial interrogation: the interview was short, in her home, and conducted respectfully. Just like in *Saylor* and *Martinez*, the officers here were able to call Scott's story into question while not subjecting her to arrest-like pressure.

Finally, at the hearing, Scott's counsel raised the argument that because the agents initially did not inform Scott that they were there to investigate her, that the initial deception and mid-interview revelation of their intent rendered Scott's interview custodial. As the Court understands it, Scott's counsel argued that the shock of finding out that *she* was under investigation, not others, would have created fear and apprehension in an objective reasonable person such that they would be subjected to custodial interrogation. Alternatively, Scott's counsel could mean that this confusion itself rendered Scott's interview custodial from the start. Scott's counsel cited *United States v. Boyd*, 910 F. Supp. 2d 995, 1002-07 (W.D. Mich. 2011), and stated that had Scott known that she was under investigation, she would not have invited the Special Agents inside as she did.

First, *Boyd* is inapposite. *Boyd* is a Fourth Amendment case, not a Fifth Amendment case. There, police officers knocked on a suspect's door, claiming to be "Tim from maintenance," and then responded "we're not leaving" to a request to come back later. Consent must be knowing and voluntary to serve as an exception to the Fourth Amendment's warrant

10

requirement. In *Boyd*, the Court found that the deception meant that the police had not received valid consent to enter. *Id.* The Fifth Amendment is not mentioned at all in *Boyd*, nor did the court consider anything having to do with custodial interrogation. This case is not relevant to whether Scott's statements should be suppressed under *Miranda*.

Moreover, Scott's counsel's argument that the police deception put "custodial" pressure on Scott is contradicted by caselaw. The Supreme Court has held that "*Miranda* forbids coercion, not mere strategic deception . . . ." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990). "Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." *Id.* The fact that the agents chose not to reveal their true focus to Scott until later in their conversation may well have been intended to make her more comfortable and less defensive in answering their questions—and it clearly was not full disclosure of their purpose. But use of such a ploy does not amount to compulsion or coercion. The Fifth Amendment does not require police not to lie to suspects, it provides that "no person . . . shall be compelled to be a witness against himself." U.S. Const. Amd. 5. In *Miranda* and its progeny, the Supreme Court found that the atmosphere of being held in custody at the police station, and not allowed to leave, created an inherently coercive environment that would compel a person to testify against himself if he were not advised of his rights.

Thus Supreme Court precedent requires that suspects be given the Miranda warnings when they are subject to custodial interrogation. One might be able to imagine non-custodial settings in which conduct by the officers might be sufficient to cause a reasonable person to believe that they were in custody, or that they are being forced to testify against themselves, but this is not that case.

The Special Agents' conduct here did not subject Scott to custodial interrogation.

### c.   Scott Was Free to Move

When suspects are not subject to physical restraint, it suggests that the suspect is not in custody. *See United States v. Swanson*, 341 F.3d 524, 530 (6th Cir. 2003) (although subject was not free to leave, "he was not in handcuffs or in any other way restrained"). Courts also look for whether the police "made any show of force or brandished a firearm or handcuffs, or any other equipment ordinarily associated with formal arrest or custody." *Mahan*, 190 F.3d at 421-22. Scott has made no allegations that she was subject to physical restraint, nor that the officers made any show of force. This suggests that her interview was not custodial interrogation.

### d.   The Investigators Told Scott Her Interview Was Voluntary

Scott admits that the agents told Scott that her interview was "completely voluntary." ECF No. 21, PageID.145. The Sixth Circuit has

held that where a suspect was explicitly told that they were not under arrest and that they did not have to speak with the police if they chose not to, this was what was "[m]ost important to their analysis" of finding that the suspect was not in custody. *Swanson*, 341 F.3d at 530. The Court is also persuaded by this fact. Because the Special Agents told Scott that her interview was "completely voluntary," this heavily weighs towards a finding that she was not subjected to custodial interrogation.

### e.    Suppression is Not Justified

The Court's review of the *Hinojosa* factors and the facts of Scott's case leads to the conclusion that Scott was not subject to custodial interrogation. She was in her home, a place where persons objectively feel in control. She was told her interview was voluntary. The agents only spoke with her for around thirty minutes, and did not threaten or otherwise coerce her. These facts and the relevant caselaw show that Scott was not subject to restraints associated with formal arrest. The Special Agents were therefore not required to give Scott the *Miranda* warnings before speaking to her, and the Court will not suppress her statements under the Fifth Amendment.

### 3.    Scott Did Not Invoke Her Right to Counsel

Moreover, Scott did not make an "unambiguous or unequivocal request for counsel" that would require the police to stop questioning her until an attorney representing her was present. *See Davis v. United States*, 512 U.S. at 458, 461-62. She alleges that she "explicitly asked

whether she needed an attorney." ECF No. 21, PageID.145. After she asked this question, the Special Agents continued to question her. *Id.*

First, even if Scott had made an unambiguous request for an attorney, it would not have required the agents to stop interviewing her. The Fifth Amendment right to counsel does not apply outside of custodial interrogation. *See Bailey v. Haas*, No. 15-CV-12727, 2018 WL 4637334, at *10 (E.D. Mich. Sept. 27, 2018) (Friedman, J.) (finding that the petitioner's "request for counsel at the time of booking thus cannot be said to constitute an invocation of his right to counsel during custodial interrogation because no interrogation had yet been undertaken."); *McNeil v. Wisconsin*, 501 U.S. 171, 182 n. 3 (1991) ("We have in fact never held that a person can invoke his Miranda rights anticipatorily, in a context other than "custodial interrogation . . . .").

And even if Scott had been in custody, courts find that "[m]erely asking the interviewing officers whether one should have an attorney present . . . is not an unambiguous and unequivocal request for legal representation," that would trigger the requirement for the police to stop their questioning. *United States v. Mays*, 683 Fed. App'x 427, 433 (6th Cir. 2017) (*citing Davis*, 512 U.S. at 462 (where the Supreme Court found that "Maybe I should talk to a lawyer" was not an unambiguous request for counsel)). Scott's question of whether she needed an attorney is similar to the questions in *Mays* and *Davis*: it asks whether she needed an attorney, but does not *request* an attorney. Therefore, she did not

14

make an unambiguous and unequivocal request for legal representation, and the Special Agents were not under a Fifth Amendment obligation to stop questioning her.

### 4.    Scott's Motion to Suppress is Denied

For the reasons stated, the Court **ORDERS** that Scott's Motion to Suppress, ECF No. 21, is **DENIED**. The Fifth and Sixth Amendments do not justify suppressing the statements Scott made to the government agents in her April 12, 2024 interview.

### B.    Motion to Dismiss

On January 21, 2025, Scott filed a Motion to Dismiss the government's indictment against her. ECF No. 23. The government filed a Response on February 11, 2025. ECF No. 28. Scott advances several grounds for her requested relief. However, the Court finds that dismissing the Indictment against Scott would be inappropriate. Therefore, Scott's Motion to Dismiss will be **DENIED**.

### 1.    Alleged Problems with Count One

Scott argues that Count One of the Indictment is invalid for several reasons. ECF No. 23, PageID.165. Count One alleges that Scott conspired to defraud the United States and unlawfully pay kickbacks for referrals. ECF No. 1, PageID.5-6.

### a. The Anti-Kickback Statute has no "Relevant Decisionmaker" Requirement

Scott's first argument about Count One is that her marketers could not participate in a conspiracy to pay Marshall and others for referrals, because those marketers did not have "power and influence" over Scott. *See* ECF No. 23, PageID.167-69. Scott argues that under the Anti-Kickback statute, no liability can attach "unless the 'person' who receives remuneration is a 'relevant decisionmaker' with formal authority to effect the desired referral or recommendation." *See United States v. Shoemaker*, 746 F.3d 614, 627-28 (5th Cir. 2014) (rejecting a district court's adoption of this argument) (*quoting United States v. Miles*, 360 F.3d 472, 479-80 (5th Cir. 2004)).

Scott's argument is based on a reading of an older Fifth Circuit opinion, *Miles*, which reading later Fifth Circuit decisions have rejected. The *Miles* court found that an *advertiser* could not be liable for receiving kickbacks because the advertiser could not improperly influence the "relevant decisionmaker," the patient. 360 F.3d at 479-80. But the Fifth Circuit explicitly rejected Scott's argument that a payee—Marshall, in this case—with "relevant decisionmaker" status is a requirement for liability under the Anti-Kickback Statute. *Shoemaker*, 746 F.3d at 629. "Rather, we merely used the term 'relevant decisionmaker' as shorthand—to characterize remuneration recipients who were paid with the culpable intent to induce referrals." *Shoemaker*, 746 F.3d at 628; *see*

16

*also United States v. Gibson*, 875 F.3d 179, 189 (5th Cir. 2017) ("The AKS has no relevant decision maker or medical judgment requirement. The statute criminalizes payments made to any person with the requisite intent.") (quotations, citations, internal formatting removed).

Here, the government has alleged that Scott paid Marshall with the culpable intent to induce referrals. *See* ECF No. 1, PageID.5-6. If proven, that is enough for liability under the Anti-Kickback Statute. *See Shoemaker*, 746 F.3d at 628; *Gibson*, 875 F.3d at 189. While Scott argues that the marketer, Marshall, must have had power and influence over Scott herself in order for the statute to criminalize kickbacks, this is incorrect. *See* ECF No. 23, PageID.169. If the evidence shows that Scott paid Marshall in exchange for Marshall sending patients to Scott, then it would be sufficient to show that Scott and Marshall conspired to refer patients in violation of the Anti-Kickback Statute.

### b.  Count One Does "Distinguish" the Conspiracy to Defraud the United States from the Conspiracy to Pay Kickbacks, and Specifies the "Deceitful and Dishonest" Means of Those Offenses

Scott also alleges that Count One of the Indictment is defective because it does not "distinguish the conspiracy to defraud the United States from the conspiracy to violate the [Anti-Kickback Statute]." *Id.* at PageID.175-76. Scott's arguments on this point are unclear. However, the government explains that the Indictment separately charges the *submission of claims to Medicare* based on kickbacks, which defraud the

17

United States, and the *payment of kickbacks itself*. ECF No. 28, PageID.232-33.

Scott also argues that Count One "fails to specify any specific deceitful or dishonest means" by which she defrauded the United States. ECF No. 23, PageID.176. This is incorrect. The Indictment states that Scott defrauded the United States by submitting fraudulent claims to Medicare. ECF No. 1, PageID.8. Scott does not provide arguments which support dismissing the Indictment, and her Motion is **DENIED**.

### c. Count One Sufficiently Alleges that Scott Knew Her Conduct was Unlawful

Scott argues that the Indictment should be dismissed because it does not correctly state the *mens rea* for a violation of the Anti-Kickback Statute, but rather just states the *mens rea* for conspiracy. ECF No. 23, PageID.171-72. This is incorrect. While Scott is correct that conspiracy has both the intent elements of furthering the unlawful purpose and proving the underlying substantive offense, *see Nora*, 988 F.3d at 830, the Indictment states both intent elements for Scott's alleged violation of the Anti-Kickback Statute. "Scott, did **willfully** . . . and **knowingly** combine, conspire, confederate, and agree with Kysha Marshall and others to . . . offer and pay renumeration . . . in violation of [the Anti-Kickback Statute]." ECF No. 1, PageID.6 (emphasis added).

Moreover, the Indictment proceeds to state that "Scott and Kysha Marshal knew and understood that it was illegal to pay and receive

kickbacks and bribes in exchange for the referral of Medicare beneficiaries." *Id.* at PageID.8. So, the Indictment stated the required *mens rea* of conspiracy: to further the conspiracy's common unlawful goals. *United States v. Trevino*, 7 F.4th 414, 425 (*quoting United States v. Merriweather*, 78 F.3d 1070, 1078 (6th Cir. 1996)). And it states the required *mens rea* under the Anti-Kickback statute: paying kickbacks for referrals while knowing that it is illegal to do so. *See Nora*, 988 F.3d at 830 n. 3. Therefore, the Indictment is not defective, and Scott's Motion to Dismiss it is **DENIED**.

### 2.   Constitutional Arguments

Scott argues that the Anti-Kickback Statute is unconstitutional and that the Indictment must therefore be dismissed. The Court does not find support for this argument, and Scott's Motion to Dismiss will be **DENIED**.

### a.   "The AKS Does Not Afford Fair Notice That Paying Marketers to Obtain Patient Leads is a Crime"

Scott argues that the Anti-Kickback Statute is unconstitutional as applied. ECF No. 23, PageID.172. One of the reasons she claims the statute is unconstitutional is because it is too vague. "The AKS does not define the criminal offense with sufficient definiteness that ordinary people can understand that paying marketers to obtain drug testing orders and urine samples from physicians is a crime." *Id.* at PageID.173. Courts reject this argument. "Section 1320a–7b is not a highly technical

tax or financial regulation that poses a danger of ensnaring persons engaged in apparently innocent conduct. Indeed, the giving or taking of kickbacks for medical referrals is hardly the sort of activity a person might expect to be legal . . . ." *United States v. Starks*, 157 F.3d 833, 838-40 (11th Cir. 1998) (also citing other cases finding the Anti-Kickback Statute is not vague). In particular, the fact that the Anti-Kickback Statute only criminalizes conduct where the defendant knows it to be illegal prevents it from being unconstitutionally vague. *Starks*, 157 F.3d at 840. The Anti-Kickback Statute is not unconstitutionally vague, and Scott's Motion to Dismiss will be **DENIED**.

### b. "The Anti-Kickback Statute is an Overbroad Regulation of Commercial Speech"

Scott argues that the Anti-Kickback Statute is also unconstitutional because it violates the First Amendment. ECF No. 23, PageID.174-75. But as the government argues, courts have routinely rejected the argument that the Anti-Kickback Statute violates the First Amendment. *See United States v. Berkeley HeartLab, Inc.*, No. CV 9:14-230-RMG, 2017 WL 4803911, at *12 (D.S.C. Oct. 23, 2017). "[S]peech 'used as an integral part of conduct in violation of a valid criminal statute' is not protected by the First Amendment." *Berkeley HeartLab, Inc.*, 2017 WL 4803911, at *12 (*quoting United States v. Stevens*, 559 U.S. 460, 471 (2010)). If, as alleged, Scott used speech while conspiring to defraud the

United States or illegally pay kickbacks, the First Amendment will not protect such speech. Scott's Motion to Dismiss is **DENIED**.

### III. CONCLUSION

For the reasons stated, Scott's Motion to Suppress, ECF No. 21, and Scott's Motion to Dismiss, ECF No. 23, are **DENIED**.

**SO ORDERED.**

Dated: May 29, 2025          /s/Terrence G. Berg
                             _____
                             HON. TERRENCE G. BERG
                             UNITED STATES DISTRICT JUDGE